**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fundador COTTS, Victor Fernandez, and Carlos Rodriguez, Defendants–Appellants.**

**Nos. 92–4121, 92–4127 and 93–1048.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1993.

Decided Jan. 7, 1994.

301

Barry R. Elden, Asst. U.S. Atty., Francis C. Lipuma, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Joseph R. Lopez, Kevin E. Milner (argued), Law Offices of Kevin E. Milner, Chicago, IL, for Fundador Cotts.

Luis M. Galvan (argued), Office of the Federal Defender Program, Chicago, IL, for Victor Fernandez aka Marce.

Irwin L. Frazin (argued), Janis S. Marzuki, Chicago, IL, for Carlos Rodriguez aka Tony Tata.

Before GIBSON,* CUMMINGS and FLAUM, Circuit Judges.

* The Honorable Floyd R. Gibson of the Eighth Circuit is sitting by designation.

FLAUM, Circuit Judge.

After a jury found them guilty of various drug and gun offenses, Fundador Cotts, Victor Fernandez and Carlos Rodriguez were sentenced under the Sentencing Guidelines to lengthy prison terms. Dissatisfied with their lot, these men have raised various challenges to the district court's application of the Guidelines in their respective cases. Because we find no error in any of the district court's sentencing-related determinations, we affirm.

## I.

All the convictions in this case stem from a rather elaborate and quite successful government sting operation. Through the help of a confidential informant, an undercover agent was able to gain the confidence of the defendants and pose as a relatively large-scale drug trafficker. The agent negotiated several "reverse buys" in which multiple-kilogram amounts of cocaine were to be sold to the various defendants. Using audio and video tape recordings and other concerted surveillance techniques, the government was able to chronicle in detail defendants' active participation in the proposed drug transactions. As a result, defendants were convicted and sentenced on multiple charges. On appeal, they only contest their sentences, challenging the individual offense-related Guideline determinations that the district court made from its inspection of the accumulated investigative information. We will recount the evidentiary details of this case most pertinent to the disputed sentencing decisions.

In early April, 1992, a confidential informant (CI) in the employ of the government had a series of telephone conversations with defendant Cotts and Victor Torres in which the latter two men inquired about opportunities to purchase cocaine from the CI's source. The CI introduced the two men by telephone to a special agent of the Northeastern Metropolitan Enforcement Group (an Illinois agency investigating narcotics crimes in conjunction with the federal Drug Enforcement Agency) posing as the CI's cocaine supplier. Cotts proposed a purchase of five kilograms of cocaine from the agent at a price of $18,000 per kilogram. When Cotts mentioned that he only had $48,500 currently available, the agent told Cotts that he would sell three kilograms and only if Cotts could provide $50,000 in cash and pay off the remaining $4,000 shortly after the initial exchange of drugs and money. Cotts agreed. Minutes after this conversation establishing the terms of the deal ended, telephone records show a call being placed from Torres' residence to the residence of defendants Rodriguez and Fernandez.

On April 16, Torres and the agent spoke again. Torres indicated that he and Cotts had assembled the money and would meet the agent later that day at the Hillside shopping center to consummate the transaction. He also mentioned that he and Cotts would later be able to purchase another five kilograms from the agent. At 4:30 p.m., Cotts and Torres arrived at the Hillside parking lot in Cotts' car. They met the agent in the parking lot and showed him a bag in the trunk of Cotts' car that contained $52,000 and indicated their readiness to carry out the exchange. The agent then told Cotts and Torres that he would retrieve the cocaine from his car. Instead, he clandestinely signalled other agents in the area to converge and execute an arrest. The agents detained Cotts and Torres, recovered the $52,000 and an electronic scale from Cotts' car, and seized a loaded nine millimeter pistol from Cotts' waist. The officers also simulated an arrest of the agent in order to deflect any suspicion of the agent's police connection. Cotts and Torres were allowed to leave after a check revealed no warrants outstanding for either man. That evening a phone call was made from Torres' residence to the Rodriguez/Fernandez residence, and Rodriguez and Fernandez met with Cotts at his house that night.

Several days later, the agent again spoke with Torres on the telephone. Torres mentioned that Cotts was upset about the incident at Hillside on April 16 and suspected that the CI had tipped off the police. The agent said that he believed someone other than the CI was probably responsible for disclosing the planned transaction to the police. In subsequent conversations that same day, Torres told the agent that Cotts wanted

the agent to meet with him and his son and that Cotts had already tried to page him several times at his beeper number.

Soon after the agent's last conversation with Torres, Cotts did page the agent, and the two conversed by phone. After discussing the events at Hillside with the agent, Cotts handed the phone over to Rodriguez whom Cotts introduced as his son. In the discussion that followed, Rodriguez said that some of the money seized at Hillside was his and that it was he who was supposed to have picked up the drugs there. Rodriguez also stated that he had some police connections and would use them to investigate the source of the leak that seemingly doomed the Hillside venture. Furthermore, in this conversation and a later one, Rodriguez asked the agent to sell him more cocaine and assured the agent that he was willing and able to purchase ten to twenty kilograms.

On April 24, Rodriguez and the agent spoke again. The agent told Rodriguez that the informant was probably a (fictitious) person named Indy and asked Rodriguez to check Indy's license plate number through his police connections. They agreed that for one kilogram of cocaine Rodriguez would arrange to have the informant killed. Rodriguez also told the agent to supply him with as much cocaine as possible, promising that he could resell it. He told the agent that cars could be used as collateral to secure the future purchase pending an inflow of cash upon resale. After this conversation took place, two phone calls were made between the Cotts and Rodriguez/Fernandez residences, one later in the day and one the next day. On April 26, the agent called Rodriguez at a number the latter had provided. Fernandez answered, said he was Rodriguez's partner and housemate, and stated that he was the person who was going to run a check on the license plate of the supposed informant. In a phone conversation the next day, April 27, Fernandez and Rodriguez confirmed that the license plate information would be obtained. Later that same day, the agent spoke with Fernandez again and told him that twenty kilograms of cocaine were due to arrive shortly. Fernandez and the agent agreed to meet to negotiate a deal.

As arranged, Fernandez and Rodriguez rendezvoused that day with the agent at the Embassy Suites Hotel in Lombard. After discussing progress in the plot to kill Indy, the three negotiated a ten kilogram cocaine purchase. They agreed that Rodriguez and Fernandez would receive one and one-half kilograms as a good faith gesture to make up for the financial setback at Hillside, one kilogram for the hit on Indy—one-half in advance and one-half after the murder—and eight kilograms at a price of $19,500 per kilogram. Rodriguez indicated that he did not have any funds currently available to finance the transaction because of the loss he incurred as a result of the Hillside incident but said he would transfer titles to several cars to the agent as collateral and pay over $125,000 as soon as he resold five kilograms to a particular buyer. Rodriguez and Fernandez also discussed the possibility of future transactions with the agent, claiming that they could distribute at least twenty kilograms of cocaine per week.

After the agent left the hotel, Rodriguez and Fernandez spoke with three men who apparently had been conducting surveillance of the meeting, one of whom had been present at Cotts' garage with Rodriguez and Fernandez on the evening of the Hillside incident. The three observers left the Embassy Suites in a car registered to Cotts. That evening the agent had several telephone conversations with Rodriguez, and the two finalized plans for the upcoming deal. Rodriguez said that he had a buyer to whom he would deliver five of the ten kilograms while the agent and Fernandez would remain in the hotel room and wait for him to return with the proceeds of that resale. On the appointed day, April 28, the agent and Fernandez reconfirmed the deal by phone.

In the afternoon, the agent, Rodriguez and Fernandez met in a room at the Best Western hotel in Elk Grove Village. After Rodriguez and Fernandez discussed how and when they would carry out the killing of Indy, Rodriguez presented the agent with five car titles as collateral for the pending cocaine transaction, stating that the cars were Cotts'. Also, Fernandez mentioned that half of the money seized at Hillside was his and Rodri-

guez's and the other half was Cotts'. Another law enforcement agent, posing as the agent's girlfriend, then entered the room with two kilograms of cocaine that Rodriguez and Fernandez proceeded to examine, apparently to their satisfaction. The four then left the room and walked to the agent's car in order to transfer the other eight kilograms of cocaine to Rodriguez and Fernandez. In the parking lot, more agents moved in. They executed the arrest of Rodriguez and Fernandez, in the process seizing a loaded .22 caliber handgun from Rodriguez. That same day three phone calls were made from Cotts' home to the Rodriguez/Fernandez residence. That evening Cotts and Torres were arrested.

After a seven count indictment against the four men was returned, Torres pled guilty to two drug-related charges, and he is not a party to this appeal. The other three defendants exercised their right to a jury trial. All were found guilty of attempt and conspiracy to possess with intent to distribute multiple kilograms of cocaine, 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. § 2, and using and carrying a firearm while committing a drug trafficking offense, 18 U.S.C. § 924(c)(1). Cotts and Rodriguez also were each convicted of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). In determining the defendants' base offense levels for sentencing purposes, the district court found all three accountable for the combined thirteen kilograms of cocaine from the April 16 and April 28 transactions. Cotts also received two two-point upward adjustments, one for having a leadership role in the criminal activity and another for obstructing justice while testifying at trial. Rodriguez and Fernandez each received single two-point adjustments for attempting to obstruct justice by negotiating for the murder of the invented informant.

Cotts, Fernandez and Rodriguez protest that the district court erred when it attributed all thirteen kilograms of cocaine to each of their actions. Cotts asserts that the three kilogram transaction on April 16 is the only conduct relevant to his sentencing calculus because he played no part in the later deal. Rodriguez insists that the ten kilograms involved in the second transaction cannot be counted towards his sentence because he in fact had nothing of a significant value to exchange for that cocaine. Fernandez figures that he was only in for two kilograms, on the theories that he had nothing to do with the April 16 deal and that there were in fact two separate deals on April 28, with the latter one for eight kilograms not having been reasonably foreseeable to him. Fernandez makes the related but seemingly alternative argument that he was the victim of sentencing entrapment because the government did not arrest him after the "first" April 28 deal was consummated but instead delayed apprehension in order to saddle him with the larger amount in the "second" deal of the day. This "outrageous government conduct," he maintains, is a mitigating circumstance not adequately taken into consideration by the Sentencing Commission and thus, pursuant to 18 U.S.C. § 3553(b), calls for a departure from a guideline sentence. Fernandez also challenges his obstruction of justice enhancement on the ground that he did not intend to impede an ongoing investigation by planning to kill a supposed informant. Finally, Cotts disputes that his conduct warrants the enhancement he received for having a leadership role in the criminal activity.

## II.

### A.

The district court found each defendant responsible for thirteen kilograms of cocaine. Under the Sentencing Guidelines this quantity translates into a base offense level of 32. The defendants have an interest in seeing each of their attributed amounts reset beneath five kilograms in order to lower their respective offense levels by at least two, and as much as four (if their individual accountabilities are determined to be limited to quantities in the two to three-and-a-half kilogram range).

Section 1B1.3(a)(1)(B) of the Guidelines instructs that "in the case of jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activi-

ty" are relevant to the determination of a defendant's offense level. When the joint criminal activity is a drug trafficking conspiracy, "[e]ach conspirator is responsible for the amount of cocaine he actually distributed and the amount involved in transactions reasonably foreseeable to him." *United States v. Goines,* 988 F.2d 750, 775 (7th Cir.), *cert. denied,* —— U.S. ——, ——, ——, 114 S.Ct. 241, 483, 558, 126 L.Ed.2d 195, 433, 458 (1993). Applying the preponderance of evidence standard, the sentencing court makes this determination based on the evidence in the case and its own credibility assessments. *See United States v. Banks,* 964 F.2d 687, 692 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992); *United States v. Edwards,* 945 F.2d 1387, 1391 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992). Because it is a factual finding, the district court's conclusion will not be upset unless clearly erroneous. *See Goines,* 988 F.2d at 775.

■ Cotts acknowledges that three kilograms of cocaine were properly attributed to him based on his obvious role in the April 16 transaction. What he disputes is the district court's finding that he is also accountable for the ten kilograms of cocaine that were the subject of the April 28 deal. Rodriguez and Fernandez conducted that transaction, Cotts reminds us, not he, and he insists that deal was not the subject of any agreement or coordinated effort between him and them. The jury, however, convicted the defendants of participating in a single conspiracy after being expressly instructed not to convict on the conspiracy count if it could only find that the evidence showed the existence of multiple separate conspiracies or acts. Thus, the guilty verdict established the existence of a single conspiracy beyond a reasonable doubt. Therefore, if it was reasonably foreseeable to Cotts that a second ten kilogram transaction would take place as part of that (given) conspiracy, he is accountable for the additional amount as there is not even an intimation that he withdrew from the overarching agreement.

Cotts does not believe it is consequential, even in the aggregate, *see United States v. Villarreal,* 977 F.2d 1077, 1080 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993), that from the beginning he expressed interest in buying more cocaine than the original three kilograms, that he initiated contact with the agent after the April 16 incident, that he introduced the agent to Rodriguez when Rodriguez proposed the second sale, that he met and conversed with Rodriguez and Fernandez multiple times in the twelve days preceding the April 28 transaction and while negotiations for that later deal were ongoing, and that titles to *his* cars were used as collateral in that transaction. These pieces of evidence indicate to us, however, as they did to the district court, not only that Cotts likely was aware that his cohorts were in the process of carrying off a multi-kilogram cocaine deal— let alone reasonably foreseeing a deal of that scale—but that he probably was directly involved in the second attempted purchase. It should be no surprise that after being stung once on April 16 Cotts preferred to remain in the background for this second transaction. Being in the background, however, is not the same as being out of sight. Cotts' direct stake in the April 28 purchase considered together with the evidence of his continuing communications with Rodriguez and Fernandez strongly supports an inference that he was involved in that day's business, an inference further buttressed by the fact that it was Cotts who brought Rodriguez and the agent together to negotiate the second deal. Consequently, we cannot conclude that the district court clearly erred in attributing the ten additional kilograms of cocaine to Cotts.

■ Fernandez sees even starker divisions of involvement and responsibility in the April attempts to purchase cocaine. Fernandez not only distances himself from the April 16 three kilogram transaction but also portrays the April 28 exchange as two separate transactions, maintaining that his activity on the latter date was very narrowly confined to a trade of two kilograms of cocaine for his promise to murder the suspected informant. His depiction of the events of April 28, however, is completely unsupported, and indeed belied, by the collected evidence. Fernandez participated in the meeting at the Embassy

Suites on April 17 when the ten kilogram purchase was negotiated; he called the agent on April 28 to confirm the deal; he accompanied Rodriguez to the Best Western parking lot for the transfer of the balance of the cocaine from the agent's trunk; and when discussing with Rodriguez who would take possession of which portion of the purchased cocaine, Fernandez clearly exhibited his involvement in the undivided transaction, at one point saying that he would take control of the entire amount. These incidents illustrate that Fernandez was an active player in a ten-kilogram deal. That he may have had a special responsibility in providing one aspect of the bartered-for consideration—the murder—cannot obviate his obvious participation in the scheme generally. Because Fernandez is clearly accountable for the full ten kilograms from April 28, the district court appropriately assigned him a base offense level of 32.[1] Thus, we need not review whether the district court erred by additionally crediting Fernandez with three kilograms from the aborted deal on April 16.[2]

## B.

■■■ Rodriguez adopts a different tack for his attack on the district court's decision to attribute to him the full ten kilograms of cocaine from April 28.[3] He argues that because he did not have the money to pay for ten kilograms (and because the car titles were not even close in value to that quantity of cocaine), he should not be held accountable for the drugs involved in that "illusory" deal. Rodriguez waived this claim, however, by not raising it before the sentencing court and, therefore, on appeal he must demonstrate plain error. *See Goines,* 988 F.2d at 777. He does not.

1. Fernandez's citation to *United States v. Mojica,* 984 F.2d 1426 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993), is wholly unpersuasive. In *Mojica,* there was no evidence at all tying a minor participant—a lookout—in one drug transaction to other, wholly separate activities of the narcotics conspiracy, and therefore the district court erred in finding those other sales reasonably foreseeable to him, *see id.* at 1445–46. Here, by contrast, there is uncontroverted evidence demonstrating Fernandez's involvement at every stage of the April 28 deal.

2. Fernandez does not tire of making bold claims unsubstantiated by the record. He asserts that he was the victim of "sentencing entrapment" that constituted a mitigating circumstance not adequately taken into consideration by the Sentencing Commission and thus warranted a departure from the guideline sentence applicable in his case. *See* 18 U.S.C. § 3553(b). Entrapment, however, is not what Fernandez is really protesting. He does not argue that he lacked a predisposition to buy multiple kilogram amounts of cocaine and that his will was overborne by unrelenting government persistence. Rather, Fernandez argues that there is something unsavory about purposeful manipulation of drug amounts offered for sale in reverse-buy sting operations in order to ratchet up eventual sentences and that he was in fact victimized by such craftiness on the part of the undercover agent in this case.

There is no doubt that by providing advance notice of the sentencing consequences associated with particular drug transactions the Sentencing Guidelines grant the government, in the carrying out of its investigative and prosecutorial functions, great power to dictate the options which will ultimately be available to the sentencing court. Several courts of appeals have intimated that sentencing adjustment may be in order when the government structures its stings solely with an eye toward wielding that power. *See, e.g., United States v. Calva,* 979 F.2d 119, 122–23 (8th Cir.1992); *United States v. Connell,* 960 F.2d 191, 194–95 (1st Cir.1992). Our inclination, however, is not to subject isolated government conduct to a special brand of scrutiny when its effect is felt in sentence, as opposed to offense, determination. If we are willing to accept the assumption apparently approved by Congress that dealing in greater quantities of drugs is a greater evil, it is not clear to us what the precise legal objection to governmental behavior based on cognizance of relative penal consequences in this area could be (so long as it does not rise to the level of true entrapment or conduct "so outrageous that due process principles would absolutely bar the government from invoking judicial processes ...," *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). In any event, Fernandez presents to us no evidence that manipulation of any order occurred in his case. He and Rodriguez were eager to buy as much cocaine as possible, boasting about the amount they could "move" in a week. And, as noted, the April 28 deal was in fact a transaction for ten kilograms, contemplated and negotiated several days beforehand. Except in the mechanics of delivery, it was never a two plus eight affair as Fernandez now asserts. He and Rodriguez wanted to be larger scale distributors, and they deserved to be sentenced as such.

3. He concedes that the three kilograms involved in the April 16 transaction were correctly attributed to him.

■ Rodriguez's claim is based on Application Note 12 to § 2D1.1 of the Guidelines:

> [W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount [of drugs], the court shall exclude from the guideline calculation the amount it finds the defendant did not intend to produce and was not reasonably capable of producing.

Although the Note does not refer explicitly to reverse-buy situations, we have recognized that it theoretically has applicability to defendants caught in such a sting. *See United States v. Cea,* 963 F.2d 1027, 1031 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992) ("[The Note's purpose] is to prevent a defendant from being sentenced on the basis of idle boasts or braggadocio rather than for the amount of contraband he actually intended to produce or buy and was reasonably able to produce or buy."). However, in transactions in which the defendant is working as a mid-level distributor and drugs are to be fronted to him with the understanding that payment will be forthcoming from the proceeds of subsequent sales, a lack of cash on hand does not indicate an inability to purchase the negotiated amount. *See United States v. Cedano–Rojas,* 999 F.2d 1175, 1179 (7th Cir.1993). So long as the defendant working as a middleman genuinely intends to engage in such a pay-later transaction, his lack of currently available funds is irrelevant.[4] *See United States v. Skinner,* 986 F.2d 1091, 1094–95 (7th Cir.1993). This is precisely the type of deal Rodriguez struck with the agent, and by all indications he was serious about it. Thus, it was not plain error for the district court to attribute to Rodriguez the ten kilograms of cocaine that were the subject of the April 28 transaction.

## C.

Next we examine Fernandez's challenge to the district court's decision to credit him with a two point enhancement for obstruction of justice based on his role in the plot to murder the perceived informant. He argues that planning to murder a nonexistent informant obstructs nothing, that in doing so his intent was not to impede any investigation or prosecution but merely to wreak revenge for the informant's past betrayal, and that by basing the enhancement decision in part on his running a check on the informant's license plate after considering the same conduct as evidence of his responsibility for the April 16 transaction the district court wrongly "double counted" that conduct. We need not devote space to the merits of the last (and, in this case, very dubious) argument because the ten kilogram deal from April 28 by itself sufficed to fix Fernandez's base offense level at 32; thus, his actions in furtherance of the plan to murder the supposed informant in fact affected his eventual offense level only once—at the enhancement stage.

■ Fernandez's first argument is equally unavailing. The obstruction enhancement is applicable not just to defendants who have actually obstructed justice but also to those who have attempted to do so, *see* U.S.S.G. § 3C1.1 ("If the defendant willfully obstructed or impeded, or attempted to obstruct or impede,...."), and the district court explicitly based Fernandez's enhancement on his attempt, not his success, in obstructing justice. That Fernandez and his coplotters ultimately could not have murdered the fictitious informant does not diminish the sincerity of any efforts to accomplish that end. Futile attempts because of factual impossibility are attempts still the same. *See* Francis B. Sayre, *Criminal Attempts,* 41 Harv.L.Rev. 821, 854 (1928).

■ Fernandez is correct that enhancement under § 3C1.1 requires a specific intent to obstruct justice. *See United States v. Teta,* 918 F.2d 1329, 1333 (7th Cir.1990). Besides, Fernandez' sentence was enhanced because of an *attempt* to obstruct, and by

---

**4.** It would also not help a defendant to show that although he intended to take possession and resell the negotiated amount, he planned ultimately to bilk the seller out of his due. Furthermore, we do not believe that the degree of accountability for this type of transaction necessarily hinges on whether one puts up collateral or, if one does, what its value is. An obligation to perceived drug traffickers is likely to be regarded seriously even in the absence of traditional forms of security.

**308**

definition attempt requires that one act with the purpose of effectuating the proscribed result. In arguing he did not act with the requisite purpose Fernandez implies that his goal was to punish a snitch, not to silence a witness. The district court's finding is moderately ambiguous in this regard. The court expressly mentioned a retaliatory motive but also implied that there was an additional witness-elimination component to the murder plot.[5] Fernandez believes that any finding that he possessed the latter motive is clearly erroneous, *see United States v. Kaufmann,* 985 F.2d 884, 899 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993), and apparently feels that the former motive cannot support an obstruction enhancement. However, as things turn out, it can. Application Note 3 to § 3C1.1 provides a non-exhaustive list of examples of conduct constituting obstruction. (Unless preposterous, Application Notes are authoritative interpretations of the Sentencing Guidelines. *See Stinson v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 1913, 1915–18, 123 L.Ed.2d 598 (1993).) Item (i) specifies conduct prohibited by 18 U.S.C. §§ 1501–1516, and § 1513(a)(2) forbids intentional *retaliation* against an informant. At a minimum Fernandez was engaged in an attempt to do that—hardly an activity so far afield or innocuous that the Sentencing Commission acted irrationally in including it in this guideline; thus, Fernandez's conduct clearly warranted the § 3C1.1 enhancement that he received.

### D.

Lastly, we turn to Cotts' contention that the district court clearly erred in finding that his role in the offense was an aggravated one warranting a two level enhancement under § 3B1.1(c). *See United States v. Spillman,* 924 F.2d 721, 723 (7th Cir.1991) (noting that a § 3B1.1 enhancement is reviewed for clear error). § 3B1.1 calls for a four level enhancement if a defendant was an "organizer or leader" of a criminal activity involving at least five participants (or otherwise extensive), a three level enhancement if a defendant was a "manager or supervisor (but not an organizer or leader)" of a criminal activity of that same size, and a two level enhancement if a defendant was an organizer, leader, manager, or supervisor of a smaller criminal activity.[6] (The last enhancement comprises subsection (c).) Thus, even if Cotts was not a "organizer" or "leader," if he held a lesser role as "manager" or "supervisor," the enhancement was appropriate. While the Commentary sets out factors relevant to distinguishing leadership and organization from management and supervision (important in determining proper enhancements for defendants involved in larger criminal activities), *see* U.S.S.G. § 3B1.1, Application Note 3, it does not directly instruct how to separate supervisors and managers from rank and file criminals. However, on prior occasions we have explicitly stated that the considerations listed in Note 3 are also relevant to the latter distinction. *See United States v. Brown,* 944 F.2d 1377, 1380 n. 1 (7th Cir.1991); *United States v. Ramos,* 932 F.2d 611, 618 n. 4 (7th Cir.1991). Of particular, although not foundational, importance in this regard is whether or not a defendant exercised control or authority over other participants in the criminal enterprise. *See Skinner,* 986 F.2d at 1096–98 (discussing *Brown,* 944 F.2d at 1381).[7] Mid-level managers are distinct in

---

5. The court stated: "And from the conversations he engaged in, and Mr. Rodriguez engaged in with Agent Tovar, it was clear that they intended to do a hit on the person who gave information to the police concerning the first transaction and was responsible for the resulting seizure of $52,-000. So the intent was certainly clear, that in retaliation for cooperating with the police, Mr. Fernandez was going to actively participate in eliminating the witness. I think it is very serious. I think it is far more serious than some of the other situations where the obstruction of justice enhancement has been approved by the Seventh Circuit. I think this is a far more seri-

ous threat to the criminal justice system, in that it involves the elimination of witnesses."

6. The Background Commentary explains that the reduced consequence accorded role differences in smaller-scale activities was based on the judgment that such distinctions are of more significance in larger enterprises which tend to have clearly delineated divisions of responsibility.

7. The other factors enumerated in the Note are the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the

any enterprise because they have authority over subordinates yet do not necessarily have a hand in the overall organization or leadership of the operation.

█ In this case, there is sufficient evidence to sustain the district court's ruling that Cotts was in a sufficiently controlling position to earn him at the least a supervisory/managerial enhancement. First of all, Torres stands out as Cotts' inferior in the enterprise and as someone who did his bidding. In conversations with the agent, Torres clearly was conveying Cotts' wishes, and even though Torres initiated contact with the agent, it was Cotts who finalized the terms of the first deal. Second, Cotts' greater material involvement bolsters, albeit circumstantially, the conclusion that his role was a controlling one. Half the cash confiscated at Hillside was his. Furthermore, Torres and Cotts arrived at Hillside for the April 16 deal in Cotts' car, the observers of the Embassy Suites meeting drove off in a car registered to Cotts, and the five car titles put up as collateral on April 28 belonged to Cotts. At the very least, he ran the conspiracy's motor pool. Third, it was Cotts who introduced Rodriguez to the agent as his son, thus setting the second deal in motion. Cotts also remained in constant communication with Rodriguez and Fernandez through April 28, likely coordinating the second deal from behind the scenes. Finally, Torres, in one of his phone calls to the agent, indicated that it was Cotts who launched the program to find and punish the informant responsible for tipping off the police about the Hillside exchange. While each of these incidents, standing alone, might not support a strong inference of Cotts' control over others, taken together, they demonstrate that Cotts' role was a special one which included enough of a degree of authority over at least some of his codefendants that the district court's finding of supervisory status was not clearly erroneous.

claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, and the nature and scope of the illegal activity. Clearly, however, when our task is limited to deciding between mere managerial or supervisory status and the absence of an aggravated role altogether, the applicability

III.

For the foregoing reasons the sentences imposed by the district court are AFFIRMED.

of some of these factors is diminished. *Cf., e.g., United States v. Herrera,* 878 F.2d 997, 1001 (7th Cir.1989) (noting that the "nature and scope" factor is primarily useful for distinguishing organizers and leaders from managers and supervisors within large organizations).