**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Samuel JEAN and Joseph Ousley,**
**Defendants–Appellants.**

No. 93–1180.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1993.

Decided June 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 21, 1994.

Terry M. Kinney, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

David S. Mejia (argued), Oak Park, IL, for defendant-appellant Joseph Ousley.

Robert B. Breisblatt (argued), Welsh & Katz, Chicago, IL, for defendant-appellant Samuel Jean.

Before GIBSON,* KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

A jury convicted Samuel Jean and Joseph Ousley of attempt and conspiracy to possess cocaine with intent to distribute. The district court sentenced both of them to twenty years imprisonment. On appeal, Jean and Ousley by their respective counsel raise four arguments challenging their convictions and sentences.[1] First, they argue that they were

---

* The Honorable Floyd R. Gibson of the Eighth Circuit, is sitting by designation.

1. Appellant Jean filed a *pro se* brief in this case, arguing also that he received ineffective assistance of counsel. Although leave was granted to

denied their right under the Speedy Trial Act, 18 U.S.C. § 3161(b), to be indicted within thirty days of their arrest. Second, they maintain that the evidence at trial was insufficient to support the jury's verdicts against them on either attempt or conspiracy. Third, Jean and Ousley contend that statements made by the government in closing arguments constituted prosecutorial misconduct, thereby depriving them of a fair trial. Last, the appellants complain that the district court erred when it sentenced them on the basis of six kilograms of cocaine, instead of on the amount they had the money to purchase. We disagree with the appellants on all of these grounds, and affirm Jean's and Ousley's convictions and sentences.

## I. BACKGROUND

As part of an undercover operation, Drug Enforcement Administration ("DEA") agents posed as the owners of an air transport company, known informally as "White Cloud Airlines." The agents represented themselves as people who owned airplanes and who had the ability to transport cargo (specifically, contraband) from outside the United States into the country undetected. The DEA's undercover operation used two incarcerated men, "California" Joe, a cooperating informant, and George, an unwitting informant, to locate potential drug dealers who would find such an air transport service useful.

Samuel Jean was referred to the DEA's air transport operation by George. On December 4, 1991, Jean telephoned DEA Agent Mann, who was posing as White Cloud's owner, and introduced himself as George's friend. In subsequent conversations, Jean made plans to meet with the agents in order to "transact business." Jean told the agents of his plan to overthrow the Haitian government and install one of his friends as president. Jean offered the agents exclusive rights to use Haiti and nearby islands as a repository for flown shipments of drugs after the takeover. To fund his efforts, Jean told the agents that he would need over $300,000, plus an additional $5,000 for personal obligations. The agents promised to give Jean the money he needed, including the $5,000. The agents represented to Jean that he was to get his money from the agents' sale of cocaine.

On March 1, 1992, Jean called undercover agent Carew and told him that he had found a buyer for six kilograms of cocaine. This conversation was tape recorded by the agents. Jean told Agent Carew that the prospective buyer, Joseph Ousley, would need the cocaine right away and that Ousley had $60,000 in cash on hand to pay for the six kilograms. Jean wanted the agents to bring the cocaine to him in Washington D.C., and he agreed to pay the agents the money from Ousley. Jean expected to be paid $5,000 after the deal was consummated.

On March 2, Jean called Agent Mann to verify that the cocaine was available. This conversation was also recorded. Mann tried to convince Jean to bring Ousley to Chicago with him to meet with the agents. Jean repeatedly assured Agent Mann that Ousley had the money to pay for the six kilograms. Mann then offered to supply Ousley more than six kilograms, but Jean told the agents they should only give Ousley six kilograms the first time. Jean suggested that the agents could supply Ousley with more cocaine after they had gotten to know him better. That same day, Jean and Ousley flew from Washington D.C. to Chicago, where two DEA agents met them and took them to dinner. Jean referred to Ousley as his "friend" and his "partner." Jean discussed his Haiti plans with the agents at dinner.

The next day, the agents met with Jean and Ousley once again, this time over lunch. Again, their conversation was recorded. At this meeting, Ousley agreed to take six kilograms of cocaine for $10,000 each. Agent

file the brief, we decline to consider it. Ordinarily, as here, there is an insufficient record from which to review ineffective assistance of counsel claims when they are raised on direct appeal. *See, e.g., United States v. Sanchez*, 984 F.2d 769, 772 (7th Cir.1993); *United States v. Limehouse*,

950 F.2d 501, 503 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992) (citing cases). Jean is free to raise his ineffective assistance claims under 28 U.S.C. § 2255 before the district court.

Mann offered Ousley an additional six kilograms of cocaine on a consignment basis. Ousley replied, "Okay, that can be handled." Agent Carew asked Ousley how long it would take him to sell twelve kilograms. Ousley estimated that it would take thirty days. Ousley told the agents he could buy fifteen or twenty kilograms a month. He assured the agents that he was reliable, and that others had entrusted him with large amounts of money in the past. Ousley stated that he currently had money for "six [kilograms] maybe a couple more."

Ousley and the agents next negotiated arrangements for the delivery of the cocaine. Ousley stated that there was "no way in the world" he would be willing to transport the cocaine from Chicago to Washington D.C. himself, that it was "too big a risk for" him. Instead, Ousley insisted that the agents transport the cocaine to Washington on their own, agreeing only to "take it from there."

The agents then asked Ousley if he had brought the money for the cocaine with him. Ousley ridiculed the agents for their naivete in thinking that he would have brought the money with him to Chicago. Throughout the conversation, Ousley consistently represented that he had enough money for six kilograms at his disposal, that the money was already "wrapped" (meaning, wrapped up and ready to be moved), and that he would pay the agents when the cocaine was delivered either to Jean or to him in Washington.

The agents' recording tape ran out before the lunch meeting was over. Agent Mann testified, however, that shortly after the end of the recording, he, Agent Carew, and Ousley left the restaurant and drove to another location for the purpose of showing Ousley the cocaine. There, they met a third agent, Agent Kripp, who was waiting behind a parked car. Ousley met Kripp, and Kripp handed Ousley the keys to the trunk of the parked car.

Ousley opened the trunk and found an open duffel bag with twelve individually wrapped kilogram packages of cocaine in it. Ousley then leaned into the trunk and counted the kilograms. He removed one kilogram from the bag and cut open the wrapper with a knife one of the agents gave him. Ousley tasted the white powder that spilled from the cut and commented that it was "good stuff."

After sampling the cocaine, Ousley reiterated that he was unwilling to transport the cocaine himself, and the agents agreed to transport it for him. The agents then decided to place Ousley under arrest. Jean, who was still in the restaurant, was also arrested shortly thereafter.

## II. ANALYSIS

### A. Speedy Trial Act

The Speedy Trial Act provides in part that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). The Act also provides that "certain periods of delay shall be excluded in computing the time within which an ... indictment must be filed." *Id.* § 3161(h). One of these kinds of excludable delay is "[a]ny period of delay resulting from a continuance granted by a judge ..., if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," *id.* § 3161(h)(8)(A), commonly known as an "ends of justice" continuance. However,

> [n]o such period of delay resulting from a continuance granted by the court ... shall be excludable under the subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

*Id.* The Act sets out "factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A)...." *Id.* § 3161(h)(8)(B). The factor relevant to us here is "[w]hether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial pro-

ceedings ... within the time limits established by this section." *Id.* § 3161(h)(8)(B)(ii).

Jean and Ousley were arrested on March 3, 1992. Thus, unless the court properly granted an exclusion of time from the thirty-day computation, the Act would have required the government to file an indictment by April 2, 1992.

On March 26, 1992, the government filed a motion pursuant to section 3161(h)(8)(A) to exclude sixty days time from the speedy trial period. The government argued in its motion that because the defendants had discussed plans to purchase large amounts of cocaine, "overthrow" the Haitian government, and use Haiti as a base through which to funnel drugs, the nature of the case was so complex that they would need two extra months to investigate and obtain an indictment. At the motion hearing on March 27, defense counsel requested an opportunity to file written objections. Consequently, the court continued the matter until April 1.

At the April 1 hearing, the court expressed a reluctance to grant the government's sixty day exclusion on the basis articulated in its motion. In response, the government asked to elaborate on the details of the investigation to the court *in camera* and *ex parte*. In chambers, the government's attorney explained to the court that one of his colleagues at the U.S. Attorney's office was in the process of conducting a larger investigation involving over 200 kilograms of cocaine and $500,000 in cash, in which Jean and Ousley were possibly implicated.

After the meeting, the court stated on the record that "counsel filled me in a little bit, but, from my perspective, not enough. There is apparently another—well, others, who are more knowledgeable of the matters which he was communicating to me. So what I am going to do is exclude seven days, and then continue this until [April 9]...." The court informed the lawyers that it would hold another *in camera* conference with the government alone to hear from the "more knowledgeable" individuals, and then rule on the government's motion orally on April 9. The court entered a minute order dated April 1 excluding the seven days. The written entry

did not contain any additional reasons for the court's ruling.

On April 3, the court held the second *in camera* conference with the government. The government brought the assistant U.S. Attorney who was conducting the ongoing investigation to the meeting. The assistant U.S. Attorney explained to the court that Jean and Ousley were part of a long-term organized crime investigation involving a great number of recorded telephone conversations between cooperating and noncooperating incarcerated individuals and suspected Colombian drug dealers. As a result of this investigation, the DEA had arrested three separate groups of individuals, one of these groups being Jean and Ousley. The government told the court it would need thirty additional days to review all of the recorded phone calls and decide whether to charge one large conspiracy covering the three groups of arrested individuals or else charge Jean and Ousley in a separate case. The court granted the government's request, and entered a minute order dated April 6 excluding the thirty days.

At the April 9 hearing, the court stated that after having heard the government's reasons for an exclusion of time, it was "persuaded by their presentation that it was in the interest of justice, and, given the complex nature of the matter, to extend it" thirty days. The court explained that it could not give more specific reasons because the details related to an ongoing grand jury investigation. Defense counsel objected to the thirty day exclusion on the ground that the court had never set forth its reasons for excluding the initial seven days, either orally or in writing as required by the Act, and that the time within which the indictment must have been filed had already passed as of April 2.

Jean and Ousley were finally indicted on April 30, 1992, fifty-eight days after their arrest. They then moved to dismiss their indictment for violation of the Speedy Trial Act, and the court denied their motion.

Jean and Ousley now contend that their indictment should have been dismissed because (1) the district court failed to articulate specific oral or written findings regard-

ing either the April 1 and April 6 exclusions; and (2) the government's proffered reasons were insufficient to justify an exclusion of time. To obtain a reversal of a district court's decision to grant a continuance under the Speedy Trial Act, the appellants "must show either legal error or an abuse of discretion. 'Absent legal error, exclusions of time cannot be reversed except when there is an abuse of discretion by the court and a showing of actual prejudice.'" *United States v. Marin*, 7 F.3d 679, 683 (7th Cir.1993), *cert. denied,* ‒‒ U.S. ‒‒, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994) (citing *United States v. Scott*, 784 F.2d 787, 789 (7th Cir.1986), *cert. denied,* 476 U.S. 1145, 106 S.Ct. 2257, 90 L.Ed.2d 702 (1986)).

### 1. *"Reasons" Requirement of the Act*

The Speedy Trial Act's requirement that district courts set forth their reasons for granting an "ends of justice" continuance serves two purposes.

> First, Congress wanted to [e]nsure that a district judge would give careful consideration when balancing the need for delay against "the interest of the defendant and of society in achieving speedy trial." S.Rep. No. 1021, 93d Cong., 2d Sess. 39 (1974). Second, the requirement provides a record so that an appellate court may review the decision. *United States v. Molt*, 631 F.2d 258, 262 (3d Cir.1980).

*United States v. Brooks,* 697 F.2d 517, 520 (3d Cir.1982), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983).

We have previously held that the Speedy Trial Act does not require a district judge "to cite ... sections [of the Act] or to track the statutory language in a lengthy legal opinion." *United States v. Wiehoff,* 748 F.2d 1158, 1160 (7th Cir.1984). We also noted that "when facts have been presented to the court and the court has acted on them, it is not necessary to articulate those same facts in a continuance order." *Id.* (citing *United States v. Guerrero,* 667 F.2d 862, 866–67

(10th Cir.1981), *cert. denied,* 456 U.S. 964, 102 S.Ct. 2044, 72 L.Ed.2d 490 (1982)). Instead, the court's findings need only be "sufficiently specific to justify a continuance," *Wiehoff,* 748 F.2d at 1160, and comport with the purposes of the Act.

█ After reviewing the transcripts of the exclusion hearings, we are satisfied with the specificity of the district court's "ends of justice" findings in this case. At the April 1 hearing in which the court initially excluded seven days, the court expressed skepticism of the government's need to exclude sixty days. Before meeting *ex parte* with the government's attorney, the district judge stated in open court that it would require more information before he would "be persuaded that there [was], in fact, enough here that's unusual and complex that [the government would] need some more time." The transcript of the *in camera* meeting[2] reveals that the government told the court that Jean and Ousley may have been part of a significantly larger drug operation involving the same DEA agents. Back in open court, the district judge once again expressed his reluctance to grant the government's request to exclude sixty days. Instead, having been "filled ... in a little bit," the court cautiously excluded only seven days. Thus, the record amply indicates that the court specifically considered the complexity factor and carefully considered the facts supporting the need for delay in filing the indictment when it granted the April 1 exclusion of time, thereby serving the purposes of the Act.

Similarly, the court's statements in the hearing transcripts of April 3 and 9 adequately supported the thirty day exclusion. The court began the April 3 *ex parte* meeting by reminding the government that it "needed to provide some more detail as to what this was all about before [the court] could in good conscience say that it was an unusual or complex matter where additional time was required." After the government had in-

---

2. The government made the transcripts of the two *ex parte* proceedings available before the court ruled on the defendant's motion to dismiss for violation of the Speedy Trial Act, presumably because the grand jury investigation was completed. We note that a district court may prop-

erly maintain the secrecy of the details of an ongoing grand jury investigation when considering a motion to exclude time under the Speedy Trial Act by reviewing sensitive items *ex parte* and *in camera. See, e.g., United States v. Marin,* 7 F.3d 679 (7th Cir.1993).

formed the court about the large numbers of recorded phone calls it needed to review before it could determine how to charge Jean and Ousley, the court agreed to grant half the exclusion time the government had originally requested. At the April 9 hearing before all the parties, the court justified its ruling as "in the interest of justice ..., given the complex nature of the matter." Thus, the court again employed statutory language, stating specifically that it considered the complexity of the case in finding that the exclusion was in the interest of justice. And although the court need not recite the facts in its findings because the facts were clear from the motion and the record, we also point out that it was permissible for the court to explain to the defendants that it could not reveal "specifics" and maintain the secrecy of facts regarding an ongoing grand jury investigation.[3] The clear statement of the facts upon which the court relied, which are in the hearing transcripts, also provided a sufficient record for appellate review.

■ Viewed separately, both of the continuances the court granted were supported by sufficiently specific findings. We further observe here, however, that "the necessary findings need not be contemporaneous with the continuance order." *Wiehoff,* 748 F.2d at 1160 (citing *United States v. Janik,* 723 F.2d 537, 544 (7th Cir.1983)). Thus, we may "read these [two] hearings as a whole in assessing the adequacy of the findings." *Id.; see also Janik,* 723 F.2d at 545. Considered as a whole, these two hearings even more clearly demonstrate that before it granted any exclusion at all, the court considered in depth whether this case was unusual or complex, and whether the requested period of delay in the filing of Jean and Ousley's indictment infringed impermissibly on their speedy trial rights. We therefore conclude that the court committed no error in the manner in which it set forth its reasons for the exclusions of time.

### 2. *Sufficiency of Reasons Justifying Exclusion of Time*

■ In addition to challenging the specificity of the court's stated reasons under the Speedy Trial Act, Jean and Ousley also challenge the sufficiency of the court's reasons to justify an exclusion of time. The decision to grant a continuance and exclusion of time under section 3161(h)(8)(A) is addressed to the discretion of the district court. *Marin,* 7 F.3d at 683–85.

We find no abuse of discretion here. As we have previously discussed, the court specifically found that this case was unusual and complex enough to warrant an exclusion of time. The Act provides that this is a permissible ground upon which to grant an exclusion. 18 U.S.C. § 3161(h)(8)(B)(ii). The record reveals that the government had a large amount of evidence to review and that Jean and Ousley could have been involved in a significantly larger conspiracy than was eventually charged. Given these circumstances, it was completely within the court's discretion to determine that the government would need more time to file an indictment against Jean and Ousley.

Because we find that the district court did not abuse its discretion by excluding time based on the complexity of the case, we need not reach the issue of whether Jean and Ousley have shown actual prejudice.

### B. Sufficiency of the Evidence

Jean and Ousley argue that the jury was presented with insufficient evidence to support their convictions. They contend that because Jean and Ousley did not have any money with them in Chicago, and refused to take the cocaine from the agents on the spot, that the evidence could not establish that they conspired or attempted to possess cocaine.

■ Defendants who seek to have their convictions reversed on the basis of insufficient evidence carry a heavy burden. We review the evidence in the light most favorable to the government, and reverse only if we determine that no rational jury could have found the defendants guilty beyond a reasonable doubt. *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993). We

**3.** *See supra* note 2.

will not reweigh the evidence or judge the credibility of the witnesses. *Id.*

A conspiracy is defined as a "confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *Id.* (citing *United States v. Jackson,* 974 F.2d 57, 59 (7th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 2976, 125 L.Ed.2d 673 (1993)). To prove that Jean and Ousley conspired to possess cocaine, the Government must establish the existence of such a conspiracy, and demonstrate a participatory link between the conspiracy and each of the defendants. *See id.; United States v. Navarez,* 954 F.2d 1375, 1380–81 (7th Cir.1992); *United States v. Duarte,* 950 F.2d 1255, 1258 (7th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992). To demonstrate a participatory link, the Government must present substantial evidence that "the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *Navarez,* 954 F.2d at 1381 (citation omitted).

Similarly, the elements of attempted possession with intent to distribute cocaine are (1) the defendants acted with the intent to possess cocaine with intent to distribute; and (2) the defendants engaged in conduct which constitutes a substantial step toward commission of the offense. *United States v. Haddad,* 976 F.2d 1088, 1094 (7th Cir.1992).

The evidence of conspiracy and attempt in this case is plentiful. Although it is true that Jean and Ousley did not have enough money with them in Chicago to purchase the cocaine, and that they did not agree to take the cocaine from the agents immediately, these two facts do not tend to negate the evidence of attempt and conspiracy. The recordings of the cocaine negotiations make clear that Ousley intended to structure the transaction such that the agents would have transported the cocaine to Washington, D.C., and Ousley would have paid for the cocaine after either he or Jean received the cocaine there. To sustain a conviction, the evidence need not preclude every reasonable hypothesis of innocence, as long as the total evidence permits a conclu-

sion of guilt beyond a reasonable doubt. *United States v. Van Wyhe,* 965 F.2d 528, 532 (7th Cir.1992).

The evidence shows that it was Jean who called the DEA agents to tell them he had found a buyer for six kilograms of cocaine. Jean tried to convince the agents to bring the cocaine to his house and to allow him to collect the money from Ousley. It was Jean again who called to make the plans to fly to Chicago to transact the deal. Jean debated with the agents about the amount of cocaine they should supply to Ousley, and negotiated the price. Jean represented to the agents that he had told Ousley the price, and that Ousley had said he would have the money ready for the purchase. Jean brought Ousley with him to Chicago. Jean called Ousley his "partner." Jean was present at all of the negotiations, and did not object when Ousley stated that the agents could deliver the cocaine to Jean's house and that Ousley could then give Jean the $60,000 to pay to the agents.

The evidence against Ousley is also abundant. Ousley flew to Chicago with Jean, and Jean represented that Ousley was the buyer Jean had promised he would procure for the agents. Ousley agreed to purchase six kilograms of cocaine from the agents and agreed that the price would be $10,000 each. Ousley told the agents that he would be able to distribute twelve kilograms of cocaine in one month, and that he could handle large purchases in the future. Ousley then told the agents to deliver the cocaine to him in Washington, where he had the money "wrapped" and ready to pay to the agents. Ousley then went to the parking lot where the cocaine was located, inspected the kilograms and tested the quality of the cocaine.

We cannot say that no rational jury could have found that Jean and Ousley intended to possess the cocaine with intent to distribute and that they took a substantial step toward committing the offense. They engaged in protracted negotiations for the sale of cocaine and traveled cross-country to inspect the drugs. We also cannot say that no rational jury could have found that there existed an agreement between Jean and Ousley to possess the cocaine and that each of them

knew of the conspiracy, intending to participate in its criminal design and purpose. Jean negotiated the sale and Ousley was to finance the purchase and distribute the cocaine. We therefore hold that the evidence was sufficient to support the verdicts.

## C. Prosecutorial Misconduct

■ Jean and Ousley next contend that two of the prosecutor's statements in closing argument amounted to prosecutorial misconduct. We must begin with a bit of background. During the trial, defense counsel cross-examined a witness, DEA agent Kripp, regarding a surveillance report the agent had prepared. When questioned, Kripp admitted that despite the fact that in his surveillance report he had referred to a March 4 report prepared by Agent Carew, no such report by Agent Carew exists. In closing argument, defense counsel argued that because the March 4 report was "gone, missing or doesn't exist," the government's evidence was questionable. In response, the prosecutor stated,

> They also talk about the agents taking certain actions in this case when they are out by the car, that they didn't write reports. Well, I'll tell you what, if you are dissatisfied with a particular date on a report, write me about it. Write me at the U.S. Attorney's office and I'll make your objections known as to that.

Defense counsel objected to this statement, and the court sustained the objection. The prosecutor then went on to say, "The point I'm trying to make is, I would rather have Jack Mann and agents like him out there investigating this kind of criminal activity—" when defense counsel interrupted with another objection which the court also sustained. Jean and Ousley allege that the first statement the prosecutor made was improper because the prosecutor invited personal contact with the jurors, and that the second was improper because the prosecutor personally vouched for the testifying agent-witnesses.

■ When reviewing a prosecutorial misconduct claim, we first examine the challenged remark in isolation to determine whether it was proper. *Van Wyhe*, 965 F.2d at 533 (citing *United States v. Spivey*, 859 F.2d 461, 465 (7th Cir.1988)). If we conclude that the remark was improper, we then evaluate it in light of the entire record to determine whether it deprived the defendants of a fair trial. *Id.* In looking at the entire record, we take into account such considerations as the nature and seriousness of the prosecutorial misconduct, whether the prosecutor's statements were invited by conduct of defense counsel, whether the court gave a curative instruction, whether defense counsel had an opportunity for rebuttal, and the weight of the evidence against the defendants. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). Strong evidence of guilt eases any lingering doubt that a remark unfairly prejudiced the jury's deliberation. *Van Wyhe*, 965 F.2d at 533 (citations omitted).

The government's first remark viewed in isolation is flatly improper, not to mention flippant. Despite the attempt in its brief to characterize the statement as "merely" offering to "forward the jurors' message to the United States Attorney and DEA officials should they wish to communicate their opinions," the government can be said to have done no less than impermissibly invite personal communication from the jury regarding the case still pending before them, and perhaps even express a personal belief regarding the merit of defense counsel's argument. The government's second remark was interrupted, but even the sentence fragment treads close to the line of vouching for the credibility of at least one of the agent-witnesses.

We need not dwell on the obvious impropriety of the prosecutor's statements, however, because we do not believe that the statements so infected the trial that the defendants were denied due process. Although deserving censure, in light of the entire record, the prosecutor's two statements in closing did not amount to serious misconduct. Moreover, the court sustained defense counsel's prompt objection to the statements, and later instructed, "Opening statements, closing arguments and other statements of counsel should be disregarded, to the extent that they are not supported by the evidence.... You are to disregard any evidence to which I

have sustained an objection[ ]...." Most importantly though, the weight of the evidence of Jean's and Ousley's guilt is so great that we must conclude that the prosecutor's statements were harmless error that did not affect the fairness of the trial.

### D. Amount of Cocaine Attributed to Defendants at Sentencing

Jean and Ousley lastly claim that the district court improperly sentenced them on the basis of six kilograms of cocaine, when the evidence showed that they had only $1,662.25 between them in Chicago, and no other assets with which to pay for the cocaine. They argue that they should be sentenced only for the cocaine they were reasonably capable of purchasing.

■■■■ The court's determination of the amount of cocaine involved in an offense is a question of fact, which we review for clear error. *United States v. Cea*, 963 F.2d 1027, 1030 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992). Jean and Ousley were sentenced under Sentencing Guideline section 2D1.1. Application Note 12 of that section provides in relevant part:

In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Since Jean and Ousley were involved in a "reverse buy" case, meaning they tried to buy drugs from rather than sell drugs to undercover agents, the "reasonably capable of producing the negotiated amount" language of the Note does not fit the facts of the case perfectly. Nonetheless, we believe that the Note applies in such cases and that the defendants could not be sentenced on amounts that they did not intend and were not reasonably capable of purchasing. *See United States v. Cotts*, 14 F.3d 300, 307 (7th Cir.1994) ("Although the Note does not refer explicitly to reverse-buy situations, we have recognized that it theoretically has applicability to defendants caught in such a sting.").

■■■■ Applying the Note, we conclude that the district court did not commit clear error in attributing six kilograms of cocaine to Jean and Ousley. The amount under negotiation was six kilograms. Jean was recorded telling the agents that he had found a buyer for that amount. Jean and the agents negotiated a price of $10,000 per kilogram. At the meeting in Chicago, Ousley confirmed that he would pay the agents $60,000 for six kilograms. Ousley indicated that he had extensive experience in dealing with large quantities of cocaine, and that he could handle fifteen to twenty kilograms a month from the agents in the future. Ousley assured the agents that he had the full amount of the money "wrapped" and ready to pay to the agents when the cocaine was delivered to Washington, D.C. Jean and Ousley's statements evidence an earnest intention to possess six kilograms of cocaine.

We are not persuaded by appellant's argument that they did not reasonably have the ability to purchase the six kilograms because they only had enough money on them to purchase approximately 170 grams. Ousley was recorded scoffing at the agents for thinking that he was so naive that he would bring $60,000 in cash with him to Chicago. Ousley insisted that he had the money and that he would "give [the agents their] paper" when they "gave [him] what [he] need[ed]." He assured them not to worry, that they would "get every dime," and that he had "owed sixty and seventy thousand dollars" in the past. Furthermore, the district court had some evidence of Jean's and Ousley's ability to purchase drugs from previous convictions. Jean was convicted of smuggling close to a kilogram of 86 percent pure cocaine into the country in 1988, and Ousley was convicted of dealing 170 grams of cocaine, ranging in purity from 91 to 99 percent.

Although there was admittedly little evidence beside their own representations that Jean and Ousley had the wherewithal to purchase the cocaine, the district court did not clearly err by taking Jean and Ousley at

their word that Ousley had the $60,000 to pay for the cocaine. *See United States v. Salazar,* 983 F.2d 778 (7th Cir.1993) ("[T]he district judge was well within the bounds of reason in taking [the defendant] at his word as to his ability to deliver the goods."). We note also that the district court was not required to find that Jean and Ousley actually had the means to come up with $60,000, but only that they were "reasonably capable" of purchasing six kilograms. As we stated in *United States v. Mahoney,* "Application Note 1 to Guideline § 2D1.4 [now incorporated in Application Note 12 to Guideline section 2D1.1] stops short of directing courts to examine whether the defendant was capable of fulfilling every request of the buyer or seller, regardless of whether it went to the core of the transaction; it simply asks whether the defendant was reasonably capable of producing the negotiated amount." 972 F.2d 139, 142–43 (7th Cir.1992). We therefore hold that Jean and Ousley were properly sentenced on the basis of six kilograms of cocaine.

### III.  CONCLUSION

For the foregoing reasons, the convictions and sentences of Samuel Jean and Joseph Ousley are AFFIRMED.