46 F.3d 1134
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Diego GIL, and VINCENTE ECHEVERRI, also known as Rafael
Carrillo, Defendants-Appellants.
 Nos. 94-1713, 94-1959.
 United States Court of Appeals, Seventh Circuit.
 Argued: Nov. 3, 1994.
Decided: Jan. 19, 1995.
 
 Before COFFEY, PRATT* and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Defendants Vincente Echeverri and Diego Gil were charged with conspiring to possess with intent to distribute cocaine (count I), in violation of 21 U.S.C. Sec. 841(a)(1), and attempting to possess with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 846, count II. Echeverri plea bargained, and pled guilty to count I, while the court dismissed count II on the government's motion. Pursuant to the Federal Sentencing Guidelines and 21 U.S.C. Sec. 841(b)(1)(A), Echeverri was sentenced to 240 months imprisonment, to be followed by 10 years supervised release, with deportation as a special condition of his release, and a special assessment of $50.00. Gil was tried before a jury and was found guilty of both counts.
 
 
 2
 As to count I, Gil was sentenced to 210 months confinement, to be followed by 10 years of supervised release, and Gil received a similar sentence and supervised release as to count II, with both sentences and supervised release to run concurrent to each other. The court also imposed a $50.00 special assessment as to each count.
 
 
 3
 Both Defendants appeal their sentences arguing that the district court erred in calculating their sentences under the sentencing guidelines. The trial court concluded that each of the defendants in the conspiracy was equally responsible for possessing with the intent to distribute the thirty-eight kilograms of cocaine, rather than the one kilogram, which Gil and Echeverri claim was the only amount involved in the drug conspiracy. We AFFIRM.
 
 I. BACKGROUND
 
 4
 On January 28, 1993, Joaquin Balleza and Jose Eduardo Appedole left Houston, Texas in a red Ford Tempo, transporting thirty-eight kilograms of cocaine to Diego Gil in Chicago Illinois. They were employed by Baldemar Teran Hernandez, a Mexican drug dealer. Appedole, who had been working for Hernandez, recognized the red Tempo as one of the cars which Hernandez drove, although the vehicle was registered to a Maria Ramirez who was not involved in this prosecution. Appedole stated that he was hired to assist Balleza in driving while transporting the drugs to Gil in Chicago, but that Balleza had the ultimate responsibility to see that the drugs were delivered to Gil. Shortly after they commenced their drive, Balleza told Appedole that the thirty-eight kilograms were being sold for $20,000 per kilogram.
 
 
 5
 While en route, Randy Nixon and Jim Bob Cass, Troopers with the Texas Department of Public Safety, observed Balleza exceeding the speed limit, and driving erratically on Interstate 30, near New Boston, Texas. The officers pulled over the Balleza vehicle and Nixon questioned Balleza, the driver, and Cass questioned Appedole, the passenger. Because of discrepancies in their stories regarding their destination, as well as their point of departure, officer Nixon requested permission of Balleza to search the vehicle. Balleza gave his oral and written consent to search, and at this time officer Nixon had Balleza open the trunk.[1] Nixon discovered several kilograms of coke in the trunk, which were subsequently field tested by Nixon, and confirmed to be cocaine. After the search of the trunk he searched the rest of the car and found several cylindrical and rectangular packages of cocaine. Nixon contacted another officer, Sergeant Robert Stinson of the Texas Department of Public Safety-Narcotic Division for assistance, who also field tested the drugs and testified that they tested positive for cocaine.
 
 
 6
 During the search, the officers discovered a total of thirty-eight kilograms of cocaine in the trunk, as well as behind the seat, and on the floor board next to the side panel. It has been stipulated that twenty-nine (29) cylindrical packages containing 28.45 kilograms of 71% pure cocaine were found, as well as nine (9) rectangular packages containing approximately 9.02 kilograms of 75% pure cocaine. Balleza and Appedole were arrested. Appedole agreed to cooperate with the authorities, and to participate in a "controlled delivery" of the drugs at their point of destination in Chicago, Illinois. Stinson asked Appedole to make phone calls to Gil, in order that Stinson might corroborate Appedole's statements regarding who was going to accept delivery, as well as where the drugs were to be delivered. After Stinson determined that a controlled delivery was feasible, he contacted the Illinois State Police force, and was put in contact with the Lake County Metro Enforcement Group unit (MEG), which specializes in narcotics trafficking enforcement. Appedole, while still in Texas, called Gil and advised him that he would be temporarily delayed because he was having car problems.
 
 
 7
 On January 29, at Stinson's direction, Stinson, Nixon, and Appedole, as part of the controlled delivery, took a plane to Chicago, and met MEG agent Rod Chesser.[2] Stinson testified that as part of this delivery, they would not transport to Chicago any of the cocaine discovered in Balleza's vehicle because of the security problems involved with transporting thirty-eight kilograms of cocaine, and thus they set up a controlled buy without any real cocaine. After arriving in Chicago, Stinson turned over the drug conspiracy investigation to the Lake County MEG unit. Agents from the MEG attempted to record several telephone conversations between Appedole and Gil. While in Chicago, on January 30, 1993, Appedole made two attempts to call Gil, but the recording equipment failed. During one of these calls, Appedole testified that Gil told him that he had three buyers for the cocaine, and Gil requested a price reduction from the $20,000 per kilogram price, which was set by Hernandez, to either $18,500 or $18,000 per kilogram. Appedole replied that he would have to check with Hernandez about the reduction. The record is silent as to whether Appedole actually agreed to the reduced price.
 
 
 8
 While in Illinois, Appedole stayed at the Marriott Courtyard, in Deerfield, Illinois, the location of the subsequent controlled delivery. While there, Appedole made several calls to Gil to set up the drug buy. The calls made from the hotel were recorded, and during their conversations, Gil and Appedole used "coded" language to conceal what they were discussing, which is common in drug transactions.[3] Furthermore, Gil used a digital display pager to communicate with Appedole, and Gil gave Appedole a number for a pager that was found on Echeverri at the time of the arrest.
 
 
 9
 During the investigation, several MEG agents were assigned surveillance duty at 112 Sumac Avenue, in Waukegan, Illinois, the address of the phone number registered to Diego Gil. On January 30, agent Brian Budney observed a blue 1987 Chevrolet S-10 pickup truck, parked in the driveway at 112 Sumac Avenue. This was the same truck later observed at the parking lot at the Marriott at the time of the controlled delivery.
 
 
 10
 At about 1:30 P.M. on January 30, 1993, Appedole contacted Gil to attempt to make the final arrangement for the transaction, and Gil replied that he was coming "with a guy that works for me." Appedole suggested to Gil that he park in the Marriott Courtyard parking lot several car lengths away from his red Tempo. Appedole would take the "papers" (money) and then transfer the cocaine to Gil.
 
 
 11
 Appedole called Gil again at about 1:55 P.M. on the same day to further establish the details of the transaction. At about 2:12 P.M., Appedole contacted Gil questioning why there was such a delay in consummating this transaction, and Gil responded stating that he was "organizing the papers." Appedole called Gil once again at 2:45 P.M, and they agreed to meet at the Chi Chi's restaurant located next to the Marriott Courtyard. Appedole inquired as to how many "papers" Gil was going to bring. Gil responded "don't worry. It's, I am organizing everything. I'll be there in one hour."
 
 
 12
 At 3:16 P.M., Appedole made another call to Gil. Gil stated that he needed to see a "photo" (a sample of the cocaine). However, Appedole replied that Hernandez did not want him to cut a sample out of the cocaine. Gil stated that he would bring the person with the money to the transaction.
 
 
 13
 At 4:41 P.M. Appedole, while wired with a recording device, met with Diego Gil and Vincente Echeverri at the Chi Chi's restaurant, and the meeting was recorded on audiotape. Appedole said "bring me the person with the money." Gil said "it's that this man here has the money." (referring to Echeverri). Gil and Echeverri insisted that they needed a sample of the cocaine. Gil explained to Appedole that he was serious about completing this transaction. When asked about the money, Gil replied that "we're talking about a lot of money here...I can't give you the money now, but in twenty minutes we will be back here with it."
 
 
 14
 During the conversation, Gil told Appedole how he was going to distribute the cocaine once the sale was completed. He said "[I] have a gentleman, he's taking ten...[a]nother will take ten. Another, five. The rest will stay with him (referring to Echeverri)." At this same time, Gil and Echeverri told Appedole how they wanted the cocaine delivered to them. Echeverri told Appedole that "we'll start taking it little by little" Gil said that they would start with "five" kilograms, and that "[I]'ll bring the money, I'll leave, I'll come back for more."
 
 
 15
 Towards the end of the recorded conversation, Echeverri said that they should meet at the Marriott parking lot at around 7:30 P.M. that same night, because he had "the round waiting,...that is, that I have to first make the round." This refers to Echeverri picking up some money. He also had to "take care of clients."
 
 
 16
 At about 7:30 P.M., Gil, Echeverri, and Appedole met in the Marriott parking lot, and Gil got out of his pickup truck and entered Appedole's car. The conversation during this meeting was also recorded. During this meeting, Gil told Appedole that he had brought money to purchase one kilogram of cocaine which he was going to show to his purchasers. Appedole requested that Gil hand over the money, and Gil responded by saying that "he [Echeverri] has it there." Gil walked back to his truck, obtained the money from Echeverri and said "[t]here are 17 here, okay? 17 here, take it(referring to $17,000)." Gil showed the money to Appedole, and Appedole said he did not have the cocaine in his car and would have to go upstairs to get it. After Appedole left his car, he repeated the code phrase "the money is big," which informed the police that he had seen the money in Gil's hand. The police arrested Gil and Echeverri, and seized $16,900 in bundles of $1000.00 each from the floor of the front seat of Gil's truck. A beeper was also found on Echeverri at this time.
 
 
 17
 After Echeverri pled guilty to count I, he filed a written objection with the court, objecting to the Probation Officer's Presentence Investigation Report which recommended that he be held responsible for intending to possess and deliver thirty-eight kilograms of cocaine, the amount seized from Hernandez's vehicle in Texas. At his sentencing hearing, the court denied the objection, and determined that Echeverri was responsible for thirty-eight kilograms of cocaine.
 
 
 18
 Similarly, after Gil had been convicted by a jury on both counts, he filed a written objection to his Presentence Investigation Report which recommended that he also be held responsible for thirty-eight kilograms of cocaine. The court denied his objection, and found he and Echeverri equally responsible for the conspiracy (thirty-eight kilograms). Both defendants were sentenced pursuant to sentencing guidelines, and both now appeal their sentences to this court.
 
 II. ISSUES
 
 19
 The issue on appeal is whether the district court properly found that each defendant had the intent and ability to possess and distribute thirty-eighth (38) kilograms of cocaine, despite the defendants' claim that they had the intent and ability to possess and distribute only one (1) kilogram.
 
 III. DISCUSSION
 
 20
 The quantity of drugs found by the sentencing judge to be involved in an offense is a question of fact, and we will review the district court's determination only for clear error. United States v. Montgomery, 14 F.3d 1189, 1196 (7th Cir. 1994). Under the clearly erroneous standard, an appellate court may reverse only when the reviewing court on the entire evidence "is left with the definite and firm conviction that a mistake has been committed." United States v. Cagle, 922 F.2d 404, 406 (7th Cir. 1991), citing Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985))(quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 VINCENTE ECHEVERRI
 
 21
 Echeverri contends that the trial court erred in finding him responsible for conspiring to possess thirty-eight kilograms of cocaine. Initially, he claims that he did not aid and abet Gil in a thirty-eight kilogram transaction, nor was that future transaction reasonably foreseeable to him. He claims there was sufficient evidence to show that he attempted to purchase one kilogram, but that the record is insufficient to demonstrate that he aided Gil in a conspiracy to possess thirty-eight kilograms. We disagree.
 
 
 22
 To calculate the quantity of drugs for which a given defendant may be held accountable, the Sentencing Guidelines require that the district court consider the "relevant conduct" of the defendant. United States v. Strauser, 21 F.3d 194, 196 (7th Cir. 1994). Section 1B1.3(a) provides that the base offense level shall be determined by "all acts and omissions committed, aided, abetted,... that occurred during the commission of the offense of conviction" and Sec. 1B1.3(b) provides that the court shall consider "in the case of a jointly undertaken activity...all reasonably foreseeable acts...in furtherance of the jointly undertaken activity."
 
 
 23
 After considering Sec. 1B1.3(a)(1)(A) and Sec. 1B1.3(a)(1)(B) of the sentencing guidelines, the district court found by a preponderance of the evidence that both defendants were responsible in the conspiracy with intent to possess and distribute thirty-eight kilograms of cocaine. See United States v. Cotts, 14 F.3d 300, 305 (7th Cir. 1994).
 
 
 24
 Based upon a review of the evidence, we are of the opinion that the findings of the trial court were not clearly erroneous in holding that Echeverri was part of a conspiracy to possess with intent to distribute thirty-eight kilograms of cocaine. "The district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the conspiracy or any member of it." United States v. Robinson, 30 F.3d 774, 787 (7th Cir. 1994), quoting United States v. Tolson, 988 F.2d 1494, 1502 (7th Cir. 1993).
 
 
 25
 Much of Echeverri's participation in the conspiratorial scheme to possess with intent to distribute thirty-eight kilograms was recorded on audiotape. The record reflects that Echeverri aided and abetted Gil's attempt to possess the entire shipment of thirty-eight kilograms. The meeting at Chi Chi's restaurant helps to establish Echeverri's participation in the conspiracy. At this meeting, Gil described to Appedole how he was going to distribute the thirty-eight kilograms of cocaine. He stated that "[I] have a gentleman, he's taking ten...[a]nother will take ten. Another, five. The rest will stay with him." Appedole testified that "him" referred to Echeverri. This statement described the distribution of twenty-five kilograms, in addition to the amount that would be kept by Echeverri, which would be thirteen kilograms. It is undisputed that thirty-eight kilograms were recovered in Texas while Appedole and Balleza were travelling to Chicago to make their delivery to Gil.
 
 
 26
 To further demonstrate Echeverri's participation in the conspiracy, Gil told Appedole, while referring to Echeverri, that "it's that this man here has the money." In addition, Echeverri insisted that Appedole provided a sample before they completed the sale. He stated "[j]ust a little...just a little that's all...[h]ow are you going to see if the material is good?" Gil and Echeverri, on a number of times during their conversation, demanded to see a sample of cocaine. All of the evidence, when combined with the totality of the other evidence, substantiates the conclusion that Gil and Echeverri conspired to possess with intent to distribute thirty-eight kilograms of cocaine. Echeverri was also involved in dictating how the delivery was going to occur. Echeverri told Appedole that they intended to accept delivery of the cocaine "little by little," implying that there would be several transactions that would involve much more than the one kilogram which Gil and Echeverri were arranging to purchase for $16,900. Gil stated that they would start by purchasing five kilograms. Echeverri explained that they did not need it all at once. The following dialogue provides evidence of Echeverri actively participating in the negotiation of the sale.
 
 
 27
 Appedole: The problem is that (unintelligible) need everything? No.
 
 
 28
 Appedole: Okay.
 
 
 29
 Gil: I'll come and put them down in fives.
 
 
 30
 Echeverri: No, no, no because we don't need it all.
 
 
 31
 Gil: We don't need it all... in fives.
 
 
 32
 Echeverri: Little by Little.
 
 
 33
 Gil: I'm going to deliver because it's that I can't give it to you all at once.
 
 
 34
 Appedole: Okay.
 
 
 35
 Gil: With that amount of, it's not easy.
 
 
 36
 Appedole: That's good.
 
 
 37
 Moreover, during the recorded part of their conversations, both Gil and Echeverri frequently used the conspiratorial pronoun "we" when speaking with Appedole, concerning the drug transaction. In one conversation, Appedole told Gil and Echeverri to "go, bring the money, I'll bring you everything. And you can tell me at what time you'll return, or when you'll return with the rest and I'll call over there." Echeverri responded with "there is no problem, Look, we can do that." Later, at the Marriott parking lot, Gil told Appedole that "[i]t's that we went to receive some money they did not have it. We went to pick up some, some money and they did not have the entire amount, do you understand me?" It was Echeverri who decided that the transaction would take place at about 7:30 P.M. because he first had to "make a round" to pick up money, and he had to take care of clients. At the time of the attempted purchase, Echeverri was the one in possession of the $16,900 which was to be used to purchase the one kilogram from Appedole. Echeverri was also with Gil at the time of the attempted purchase, and arrest. In addition, when Echeverri was arrested, he had on his person a digital pager, and the number for this pager was the same one which Gil gave to Appedole.
 
 
 38
 This evidence establishes that Echeverri conspired with Gil to complete this transaction. Echeverri played a significant role in deciding to take delivery of the shipment "little by little," he knew how Gil wanted to distribute the thirty-eight kilograms, and he was present at the time of the attempted purchase. Therefore, under Sec. 1B1.3(a)(1)(A), the district court did not err in finding that Echeverri actively participated in aiding and abetting Gil in the furtherance of the conspiracy to possess and distribute thirty-eight kilograms of cocaine.
 
 
 39
 The district court further concluded that based on the evidence, Echeverri could be found responsible for thirty-eight kilograms pursuant to U.S.S.G. Sec. 1B1.3(a)(1)(B) because not only were Gil's efforts to possess and distribute thirty-eight kilograms reasonably foreseeable acts in furtherance of a jointly undertaken criminal activity, but Echeverri had actual knowledge of Gil's actions. Under this provision, "a defendant acting in concert with others may be sentenced on the basis of drug quantities that he did not handle personally." United States v. DePriest, 6 F.3d 1201, 1212 (7th Cir. 1993). "[A] defendant who pleads guilty to a conspiracy charge is held accountable, for purposes of determining his relevant conduct and the applicable guideline range, for all drug transactions that he was aware of or that he should have reasonably foreseen." United States v. Wagner, 996 F.2d 906, 913 (7th Cir. 1993), cert. denied, 114 S.Ct. 720 (1994), quoting United States v.Guerrero, 894 F.2d 261, 266 (7th Cir. 1990); See United States v. Durman, 30 F.3d 803, 812 (7th Cir 1994). "Each conspirator is responsible for the amount of cocaine he actually distributed as well as the amount reasonably foreseeable to him." United States v. Pitz, 2 F.3d 723, 727 (7th Cir. 1993), cert. denied., 114 S.Ct. 2141 (1994).
 
 
 40
 Echeverri contends that he had no knowledge of any future drug transaction between Hernandez and Gil, which involved the remaining thirty-seven kilograms, and the scope of his responsibility should be limited to conspiring to possess only one kilogram, to which he pled guilty. We disagree. This argument lacks support in the record. Initially, let us review the record of the meeting between Gil, Echeverri, and Appedole at Chi Chi's restaurant. Echeverri was present when Gil told Appedole how he would distribute the cocaine. Gil stated that "[I] have a gentleman, he's taking ten...[a]nother will take ten. Another, five. The rest will stay with him." Appedole testified that "him" referred to Echeverri. Echeverri was present when Gil stated that he would like to initially purchase "five" kilograms, and continue to purchase cocaine in five kilogram increments. Echeverri, during the same conversation, recommended that they should purchase it "little by little." Echeverri said "[l]ets see if you understand me, little by little, so there's no mistrust, or nothing like that... We are able to do it like that...easily...we'll start taking it little by little." Obviously, "little by little" does not refer to the one kilogram which Echeverri attempted to purchase for $16,900, but it refers to the remainder of the thirty-eight kilogram shipment which was intercepted in transit.
 
 
 41
 Based on this meeting, it is reasonable to conclude that Echeverri obviously was aware that this drug transaction was for the purchase and distribution of twenty-five kilograms to Gil's purchasers, including the thirteen kilograms he was going to keep for himself. Therefore, the trial court properly found that it was reasonably foreseeable that the drug negotiations were for the purchase of thirty-eight kilograms, and that Echeverri should be held accountable for this amount. Wagner, 996 F.2d at 913 (7th Cir. 1993).
 
 
 42
 Another one of Echeverri's arguments is that there was no amount larger than one kilogram under negotiation, and that he was incapable of buying additional kilograms of cocaine. This argument is likewise without merit, and is not supported by the record. It is clear that based on the meeting at Chi Chi's, there was more than one kilogram under negotiation. Not only did Gil detail the distribution of the thirty-eight kilograms to Echeverri, but Gil wanted to start taking delivery of five kilograms, and Echeverri stated that they should take delivery "little by little."
 
 
 43
 Echeverri cites to United States v. Richardson, 939 F.2d 135, 142-43 (4th Cir. 1991), cert. denied, 112 S.Ct. 942 (1992), for the proposition that to hold him responsible for the entire thirty-eight kilograms, it must be shown that he either had the funds to purchase such large quantities, or had the contacts to purchase such large amounts. For sentencing purposes, to determine the amount of drugs involved, the district courts may rely on Application Note 12 to Sec. 2D1.1 of the Sentencing Guidelines, which provides in relevant part:
 
 
 44
 In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.
 
 
 45
 U.S.S.G. Sec. 2D1.1; United States v. Mahoney, 972 F.2d 139, 141 (7th Cir. 1992) (Emphasis added).
 
 
 46
 This language in Note 12 technically does not apply to the facts of this case because the defendants were involved in a "reverse buy" where they attempted to purchase the cocaine. However, this court has held that Note 12 applies to such cases, and that the defendants cannot be sentenced for amounts of drugs that they did not intend to and were not reasonably capable of purchasing. United States v. Jean, 25 F.3d 588,598 (7th Cir. 1994); Cotts, 14 F.3d at 307 (7th Cir. 1994) ("Although the Note does not refer explicitly to reverse-buy situations, we have recognized that it theoretically has applicability to defendants caught in such a sting.")
 
 
 47
 The trial court considered U.S.S.G Sec. 2D1.1 to determine whether Echeverri intended and was capable of purchasing the entire thirty-eight kilograms. The court found that Echeverri's involvement in assembling almost $17,000 for one kilogram showed an ability to gather funds. Furthermore, the court determined that Echeverri did not have to personally supply the money for the entire thirty-eight kilograms, because Gil has arranged for other buyers, who would contribute funds towards the purchase.
 
 
 48
 Even though at the time of his arrest Echeverri had only $16,900 to purchase one kilogram of cocaine, the evidence clearly establishes that he was part of the conspiracy that had previously been arranged for the purchase of the thirty-eight kilograms. Although Echeverri did not have in his possession the money necessary to purchase the entire thirty-eight kilograms, this does not necessarily mean that he and his co-conspirator lacked the ability to obtain additional funds. Echeverri and Gil were able to obtain $16,900 to purchase one kilogram, and Gil mentioned that he had a purchaser who would take ten (kilos), another ten, another five, and the remainder would stay with Echeverri. These purchasers certainly could be a source of funds with which to purchase the rest of the thirty-eight kilograms. Furthermore, prior to the final meeting at the Marriott parking lot, Echeverri told Appedole and Gil that he (Echeverri) had to "first make a round" (obtain money), and that he had "to take care of clients."
 
 
 49
 To be held responsible for the entire amount of drugs in an uncompleted transaction, U.S.S.G Sec. 2D1.1 does not require that defendants actually have all the funds in their immediate possession, but simply that they are reasonably capable of providing the money required to make the purchase. See Jean, 25 F.3d at 599 (7th Cir. 1994); Mahoney, 972 F.2d at 142-43. Therefore, because the record demonstrates that Echeverri played a part in collecting the $16,900 to purchase the first kilogram, and he had knowledge of the availability of other sources of drug money to purchase the cocaine, it was not error for the district court to conclude that Echeverri was reasonably capable of obtaining the remaining amount of money needed to purchase the rest of the cocaine.
 
 
 50
 Echeverri's final argument is that statements made by or attributable to him regarding a larger transaction were merely bravado. Echeverri contends that no actual, specific amounts of cocaine were negotiated, and that any statements made by him did not reflect an intent on his part to purchase thirty-eight kilograms. This is contrary to the record. The district court found that there was tangible evidence to back up the negotiations because thirty-eight kilograms were recovered. In addition, the court found that there was more than one reference to quantities well over one kilogram in the course of negotiations.
 
 
 51
 We agree with the court's findings. Echeverri cites United States v. Ruiz, 932 F.2d 1174 (7th Cir.) cert. denied, 112 S.Ct. 151 (1991) to support his argument. In Ruiz, the defendant Ruiz told an informer, the customer, "I'll get you the other kilo. And if you want, even ten more I can get." Ruiz, 932 F.2d at 1184. We held that the district court erred in using the ten kilogram amount when calculating the amount of drugs involved in the conspiracy. We stated in Ruiz that:
 
 
 52
 Ruiz's single comment was not sufficient to establish that the conspiracy had as its goal the consummation of a deal for upwards of ten kilograms. Such an amount had never been mentioned to Agent Guerra; there was no evidence of other buyers for such an amount; no price had been set or even quoted for such an amount; indeed, there was no evidence of any kind that Ruiz had in his possession or had access to that amount of cocaine.
 
 
 53
 Ruiz at 1184.
 
 
 54
 However, the case at bar is readily distinguishable from Ruiz. First, thirty-eight kilograms of cocaine which was being transported by Appedole from Texas to Diego Gil in Chicago were recovered. Furthermore, there was an agreed upon price of $20,000 per kilogram. Gil even attempted to renegotiate this price down to $18,500 or $18,000 per kilogram. In addition, $700,000 worth of cocaine would not be transported from Texas to Chicago in an automobile without the accompanying safeguards and a prior agreement. Unlike in Ruiz, in this case it has been established that there were purchasers lined up to take twenty-five kilograms with Echeverri keeping the rest.
 
 
 55
 Moreover, Gil and Echeverri insisted that they wanted a sample of the cocaine to show to their clients before they would provide the money to purchase it. Echeverri stated "just a little...just a little that's all...[h]ow are you going to see if the material is good." Gil stated to Appedole that "we're talking about a lot of money here." Echeverri said that they would purchase it "little by little" and that we "don't need it all" at this point. The statements made by Echeverri were not bravado, but were part of serious negotiations with Appedole. Echeverri is responsible for thirty-eight kilograms of cocaine because he participated in a conspiracy in which it was foreseeable that the attempted purchase was for thirty-eight kilograms. Wagner 996 F.2d at 913. The record contradicts Echeverri's argument, and substantiates the district court's determination that Echeverri intended to conspire with Gil to purchase the entire shipment of thirty-eight kilograms.
 
 
 56
 We are convinced that the trial court's decision to sentence Vincente Echeverri based on an intent to possess thirty-eight kilograms was not clearly erroneous.
 
 DIEGO GIL
 
 57
 Diego Gil, Echeverri's co-conspirator, also appeals the district court decision which held him responsible for the entire thirty-eight kilograms of cocaine. Gil argues that he did not have the intent or capability of producing such a large amount of money to purchase thirty-eight kilograms, which is worth approximately $700,000. The analysis which we applied to Echeverri also applies to Gil. The evidence supports that this entire conspiracy involved thirty-eight kilograms. Gil described to Appedole how serious he was about the deal, and that he had purchasers lined up by stating "do you know I've been waiting here for a month? Why? Because I'm ready. Do you understand me? ... Yes, it's because I'm serious. You understand me? ... [I] have a gentleman, he's taking ten...[a]nother will take ten. Another five. The rest will stay with him (referring to Echeverri)." Gil mentioned that he would initially purchase "five" kilograms, and Gil was present when Echeverri told Appedole that they would purchase it "little by little." Gil stated that "[I]ll bring the money, I'll leave, I'll come back for more."
 
 
 58
 Gil and Echeverri were very cautious and insisted several times that they be provided with a sample before they were willing to pay the money. Gil explained that he had to show someone else a cut of the cocaine. He said "this guy wants to see the picture, you understand me?" Gil stated that "we're talking about a lot of money here." Gil even attempted to negotiate the sale price from $20,000 per kilogram to $18,500 or $18,000. Just prior to the attempted purchase, Gil stated that they did not have the entire amount of money for the transaction, but that he had enough to purchase one kilogram to show his purchasers.
 
 
 59
 Although at the time of the arrest neither Gil nor Echeverri actually had the money in his possession to purchase the entire thirty-eight kilograms, it must be demonstrated only that the defendants were reasonably capable of providing the money required to make the purchase. Jean, 25 F.3d at 599; Mahoney, 972 F.2d at 142-43. We hold that the trial court was not clearly erroneous in finding that Gil and Echeverri were reasonably capable of gathering the funds to purchase the entire shipment of thirty-eight kilograms. Gil stated that he had been ready for this transaction for about one month, and he told Appedole that he had several purchasers lined up to purchase twenty-five kilograms, with Echeverri retaining the rest. The record also shows that Echeverri had "clients," and that before the final meeting took place, Echeverri had to "make the round." (pick up money). Because Gil and Echeverri's conspiracy had several purchasers, and they had no difficulty in assembling $16,900 for the first kilogram, the district court was not clearly erroneous in concluding that Gil was reasonably capable of collecting enough money to purchase the thirty-eight kilograms for which he was held accountable. Therefore, we agree with the district court's finding that Gil was equally responsible for thirty-eight kilograms of cocaine in the conspiracy.
 
 IV. CONCLUSION
 
 60
 The judgment of conviction and sentences of Vincente Echeverri and Diego Gil are hereby
 
 
 61
 AFFIRMED.
 
 
 
 *
 The Honorable George C. Pratt, Circuit Judge for the United States Court of Appeals for the Second Circuit, is sitting by designation
 
 
 [1]
 The consent which Balleza gave to Nixon to search the vehicle is not challenged
 
 
 [2]
 After Appedole agreed to cooperate, at Stinson's direction, they did not drive the red Tempo, but, rather, he, Nixon, and Appedole decided to fly to Chicago and meet with the Lake County Metro Enforcement Group to organize the controlled delivery
 
 
 [3]
 Some of the coded language which was used in these negotiations included "girls," and "shirts," which refers to the kilograms of cocaine, and "papers", which refers to the money, and "picture," "photo," or "locale" which refer to a sample of the drugs